### LUMBER ANTI–STAIN CO. v. NESTER et al.

#### SAME v. SOUTH ARM LUMBER CO. et al.

(Circuit Court of Appeals, Sixth Circuit. April 5, 1910.)

#### Nos. 1,983, 1,984.

PATENTS (§ 328*)—NOVELTY—PROCESS FOR PREVENTING SAP STAIN IN LUMBER
—"WEAK ALKALINE SOLUTION."

    The Cowles patent, No. 746,678, for undressed lumber and process of preserving same, is for a process and its product, claim 1 being broadly for "that process of treating undressed lumber to prevent sap staining thereof which consists in rapidly applying to the wood a weak alkaline solution to permit said solution to penetrate only that surface depth which is planed off by the usual dressing of the wood." Claim 2 is the same, except that "a weak solution of sodium bicarbonate" is specified. Claim 3 is the same as claim 2 with the additional step of "drying the

---

lumber so treated," while claim 4 is for lumber so treated as a product. *Held*, that the "weak alkaline solution" of claim 1 includes limewater. which is both within the designation and was within the intention of the patentee, who regarded the rapid application, and not the alkali used, as the essence of his invention, and that, as limewater had been previously extensively used in the same manner for the same purpose, the claim is too broad and void for lack of novelty; also, that as limewater is thereby recognized as an equivalent of the specific alkaline solution specified in the other claims, although in fact, as proved by use, it is not as efficient, the entire patent is void.

Appeals from the Circuit Court of the United States for the Western District of Michigan.

Suits in equity by the Lumber Anti-Stain Company against George Nester, Margaret Nester, John F. Nester, Frank B. Nester, and Mary Ann Bourke, and the same against the South Arm Lumber Company, William Hibbee, and Richard P. White, respectively. Decree for defendants in each case, and complainant appeals. Affirmed.

A. C. Denison, for appellant.

F. W. Parker, for appellees.

Before SEVERENS and WARRINGTON, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. These are patent cases. They involve a single question, and that is as to the validity of patent No. 746,678, issued December 15, 1903, to George C. Cowles, assignor to Robert H. Munson. Ownership and infringement are conceded.

The patent is entitled to be for "undressed lumber and process of preserving same." The preservation aimed at is not against decay, but against discoloration stain. One of the origins of the stain is the sap in the lumber before it dries in the process of seasoning, which becomes exposed at the sawing by the splitting or tearing apart of the ducts through which it flows in the tree. For this reason the stain is called "sap stain." The process, therefore, may be said to be one for preventing sap stain in lumber.

It is claimed that the patent is invalid on two grounds. One is that the conception of the process and its product did not, as it is put, rise to the dignity of invention. The other is that it was not new. The lower court held the patent to be invalid on the first ground. We do not understand that the utility of the process, in its specific form hereinafter shown, is seriously questioned. Indeed, the testimony as to the effect of its use, the exhibits in evidence, the true theory as to how it operates to prevent sap stain, its use by the appellees and a lumber manufacturer and dealer characterizing itself as owning the largest lumber yards in the world, which is behind appellees and managing the litigation on their behalf, and the pains and expense at which they have been to overthrow the patent impress us with the notion that the process in such form, at least where the lumber is carefully piled, is quite useful. It had not, however, at the time of the preparation of these

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cases come into much general use, which may have been due somewhat to this litigation.

The patent presupposes that all lumber is liable to this blemish. The evidence, however, concerns it only in so far as it affects pine lumber and that of the North, in the states of Michigan, Wisconsin, and Minnesota and the Dominion of Canada. As already intimated, it comes into existence during the seasoning period; i. e., between the time the lumber leaves the saw and the time when the sap in it becomes dry, a period of about 60 days. It so comes mainly during the summer months, and is affected by the place and manner of piling and its surroundings. It is favored by high temperature, moist atmosphere, and much refuse material from the sawmill in proximity thereto. It is not confined to the surface of the timber. It penetrates it, and sometimes goes entirely through it. And, if not prevented, it is a source of much pecuniary loss to those interested in the pine industry of the North in depreciating the market value of the lumber affected by it. A sure cure for it, therefore, was a thing much to be desired. The cause of sap stain is now certainly known. It arises from the growth in the sap of a low vegetable organism or species of fungus. Its technical name is "blue fungus," no doubt given to it because of the color of the stain arising from it, though at times, as is testified, the color thereof may be green or black. Three experts have testified herein, and they agree that such is the source of the stain. These fungi germinate from spores—minute seeds—thrown off from the fruiting organs of others growing in the refuse material about a sawmill, blown through the air and lighting therefrom in the sap. Under favorable conditions, the air thereabouts is full of spores. They need for their growth food, water, oxygen, and heat. The latter two they receive from outside the sap, and the former two from within it, though the atmosphere may supply moisture also. The sap is composed of water and certain organic substances in solution therein. These substances nourish the tree whilst growing and furnish nutrition to the spores lighting in the sap and the organisms which develop therefrom.

The patentee, however, was not well advised as to the cause of the stain. Possibly at the date of the issuance of his patent it was not known exactly what was the cause. Its immediate cause, as he conceived it to be, was, as he puts it, "what is known as sap mold." It is not entirely clear that he understood "sap mold" to be a vegetable organism. It is certain that he did not understand it to be a growth from spores which had lighted from the air in the sap. His notion was that the sap contained acetic acid, that this acid on being exposed to the air became oxidized, that this oxidation caused fermentation, and that this fermentation induced formation of the sap mold. He thus expressed himself in the specification:

"It is, of course, understood that the mold which produces the objectionable stains is due to fermentation of the acetic acid as the latter is oxidized when drawn to the surface of the board by the flowing of the sap in consequence of certain atmospheric conditions."

He was mistaken in thinking that there is acetic acid in the sap of pine lumber to such an extent that its oxidation and fermentation would be of any consequence. The testimony is that, when present in such

178 F.—59

sap, it is to be found in traces only. But it is testified, also, that such sap always contains organic acids, of which acetic is one, and that in material quantities. It would seem, therefore, not to count for much that the patentee was mistaken in his terminology. He was mistaken also in thinking that the formation of the sap mold is due to fermentation, caused by oxidation of the acid in the sap. It is not due thereto, but, as stated, to the growth in the sap of the blue fungus from spores lighting therein from the air; and, as will be seen as we proceed, there is room to say that he was mistaken also as to how his process operates to prevent sap stain. But his mistake as to the cause thereof and as to how his process operates to prevent it is not sufficient in and of itself to invalidate the patent. If, indeed, it will operate to prevent it and is new and the conception thereof amounts to invention, the patent is valid notwithstanding he may have been in dense ignorance on both subjects. His theories, however, have a bearing on what was his conception as to the exact nature of his process—a very important consideration in this case in determining the validity of the patent. This brings us to that consideration. We desire to be quite sure that we have caught his thought here and to convince that we have caught it; for this is a matter about which there is much controversy herein.

The specification contains four claims. Of these the first three relate to the process. The last one relates to its product. According to the first two, the process consists of but a single step. According to the third one, it consists of two steps; the first of the two being that of the second claim. Generally speaking, the process of the first two claims is a surface treatment of the boards as they come from the saw with a chemical solution. By surface treatment is meant so much of the boards as is planed off in dressing them. The treatment is limited to the surface, because it was thought that a deeper one might discolor the lumber with the chemical used, so that it would be stained therefrom after being dressed, and no deeper treatment was needed to prevent the sap stain. More specifically, the process consists in the rapid application of the solution to the boards. By such application the treatment is limited to their surface. In the language of the specification it should be "as brief as possible; a fraction of a second being sufficient." As to the method of the rapid application of the solution to the lumber, the process is unlimited, though preference is expressed for dipping it in the solution. Sprinkling is another method of so doing and within the process of the patent. It is said in the specification as follows:

"The invention embraces within its scope any manipulation which will result in effecting the rapid application of the solution to the wood."

So far there is no controversy as to the nature of the process. The controversy relates solely to the chemical solution called for. It relates to that called for by the first claim only, not, however, as to what solution is called for by the letter of that claim, but what is called for by its intent. The first two claims differ in this: The process of the first claim, according to its letter, consists in the rapid application in any way of any one of a certain class of chemical solutions, to wit, alkaline solutions in a weak form. That of the second consists in the rapid application in a specific way, to wit, by dipping, of a specific al-

kaline solution, to wit, sodium bicarbonate, in such form. The controversy is as to the solution called for by the first claim according to its intent, whether it is any alkaline solution—i. e., any member of the general class of alkaline solutions—or only any member of what may be termed a subclass of such solutions to which sodium bicarbonate, the specific solution of the second claim, belongs. It is appellant's contention that the solution called for thereby should be so limited, whereas appellees contend that the process of that claim takes in any alkaline solution whatsoever. The two claims are in these words:

"(1) That process of treating undressed lumber to prevent sap staining thereof which consists in rapidly applying to the wood a weak alkaline solution to permit said solution to penetrate only that surface depth which is planed off by the usual dressing of the wood.

"(2) That process of treating undressed lumber to prevent sap staining thereof, which consists in rapidly dipping the wood into a weak solution of sodium bicarbonate, to permit said solution to penetrate only that surface depth which is planed off by the usual dressing of the wood."

The first step of the third claim is, as stated, the sole step of the second. Its second step consists "in drying the lumber so treated." It is in these words:

"(3) That process of treating undressed lumber to prevent sap staining thereof, which consists in, first, rapidly dipping the wood into a weak solution of sodium bicarbonate, to permit said solution to penetrate only that surface depth which is planed off by the usual dressing of the wood; and, second, in drying the lumber so treated."

It is agreed on all sides that the second step does not validate the patent as to the third claim if it is not otherwise valid. No further reference therefore will be made thereto.

The validity of the fourth claim relating to the product of the process hangs, of course, on the validity of the process claim. It has, however, a bearing on the patentee's theory as to how his process operates to prevent sap stain, which, as heretofore intimated, is of significance in determining the nature of his process in the particular as to which there is controversy. The process claims contain no indication of what that theory is. This claim does. When that theory comes up for consideration, it will then be quoted.

We return now to the particular in which there is controversy and to a determination of that controversy. On the decision thereof depends the question as to whether the process of the patent is new or old. This is so because for many years prior to the time from which the patent begins limewater, which is a saturated solution of slaked lime, or, chemically speaking, of calcium hydroxide, and which is conceded to be an alkaline solution, was in public use for preventing sap stain. And it was so in use at the time the patentee conceived his process. The treatment of pine lumber with it was limited to its surface only by a rapid application thereof thereto. The way in which it was so applied was by sprinkling. It is claimed on behalf of appellees that the evidence establishes that such treatment is an efficient remedy for the blemish. But the testimony as to the effect of such use of limewater and its degree of alkalinity, in connection with certain of the considerations alluded to above as impressing us with the idea that the pro-

cess of the patent in its specific form covered by the second claim is quite useful, at least when the lumber is carefully piled, causes us to seriously doubt whether the limewater remedy is efficient, even when the lumber has been carefully piled. And these cases will be disposed of upon the basis that it is not.

The appellant attempts to get rid of this limewater use as an anticipation of his process in two ways. It urges that at the time the patentee conceived his process the use of limewater for preventing sap stain was an abandoned experiment. The evidence, however, as we view it, does not justify this position. It does not bring this case within any of the cases where it has been held that an alleged anticipation of a patent was an abandoned experiment. The other way in which it so attempts is by limiting the inner content of the first claim in so far as it relates to the chemical solution of the process. According to the letter of that claim any alkaline solution is within its process, and, as limewater is an alkaline solution—conceded to be—it is within the letter thereof. Appellant would have it that the intent of this claim is not as broad as its letter, and, of course, the burden is on it to make this good. It would limit the claim to a certain subclass of alkaline solutions, which includes a sodium bicarbonate solution, the specific solution of the second claim, and does not include limewater. In the chemical class known as metals are two groups, one of which is called the "metal alkalies" and the other the "metal alkaline earths." The members of the first group are potassium, sodium, ammonium, lithium, rubidium, cæsium. Those of the second group are calcium, strontium, barytium, and possibly, also, magnesium. The base of the specific alkaline solution called for by the second claim, to wit, sodium bicarbonate, is a compound of a member of the first group, whereas limewater or calcium hydroxide is a compound of a member of the second group. Now, the limitation which the appellant would place on the first claim is that it has to do with alkaline solutions whose base is a member of the first group, or a compound thereof having the properties of an alkali, and hence does not include limewater. It is argued in the evidence that members of the second group are not alkalies, whereas those of the first are. This may be true. But it does not follow from this that no compound of any member of this group is not an alkali. Anything is an alkali which has the properties of an alkali. The distinctive property of an alkali is the fact that it will neutralize an acid. Calcium hydroxide or slacked lime has this property. It also has the property of solubility in water and of corroding animal and vegetable tissue, which are also properties of an alkali. It follows that limewater is an alkali solution. Its base has the properties of an alkali and itself has alkalinity. It will neutralize an acid, and it will corrode animal and vegetable tissue. So it is frankly conceded to be in the argument here. It is a saturated solution and as such is a weak alkaline solution.

What, then, is the basis of this position of the appellant? There is nothing in the claim itself to support it. The basis is two statements made by the patentee, one in the descriptive part of the patent, and the other in the course of the proceedings in the Patent Office prior to the issuance of the patent. But, before considering these statements and

their effect, it should be noted what there is in the specification of the patent tending to show that the intent of the first claim is as broad as its letter, so that, when we come to weigh these statements, we can have in mind the total which they have to meet.

Five times in the descriptive part of the specification the chemical solution called for by the process is referred to in the same general terms as in the first claim. Twice it is termed "alkaline solution," once "weak alkaline solution," and twice an "alkaline bath." In neither of those five instances is a limiting word used except the middle one, where the adjective "weak" is used. In each instance where the phrase "alkaline solution" is used a preference is expressed for the specific alkaline solution called for by the second claim, to wit, sodium bicarbonate, and in one of them the preference expressed is for a 5 per cent. solution thereof. These expressions thus used in referring to the solution of the process are against any limitation of that of the first claim to the particular subclass of alkaline solutions to which appellant would limit it.

In addition, we have the fact that limewater fits the patentee's theory as to how an alkaline solution acts to prevent sap stain disclosed by the specification. That theory was that an alkaline solution prevents sap stain solely through the neutralization of the acid—acetic as he mistakenly terms it—in the sap. As, according to his theory, the acid in the sap lay at the bottom of the stain, it followed that a neutralization thereof would prevent it. Four times he characterizes the chemical solution of the process as a "neutralizing agent." Once he says that the use of the solution will "neutralize the acid in the sap." Twice he terms the effect of the solution on the acid in the sap as a "neutralization," and once he refers to the sap after it has been affected by the solution as "neutralized sap."

His theory was not that the solution neutralized all the acid in all the sap in the lumber, but only so much thereof as was in the sap on its surface. In a quotation from the specification, heretofore made, he refers to the acid in the sap being "oxidized when drawn to the surface of the board by the flowing of the sap in consequence of certain atmospheric conditions"; but nowhere does he intimate in any way that he thought that after the application of the alkaline solution to the lumber there would be any flowing of the sap which would draw the acetic acid below the surface of the board thereto so that it would be neutralized thereby. On the contrary, certain expressions used show that in his thought the application of the neutralizing agent would form a protective skin or layer that would prevent any such flowing of the sap, and that he did not contemplate any further neutralization than of the acid in the sap on the surface of the board at the time of the application. In one of the instances in which he uses the word "neutralization" referred to above the expression is "neutralization of the acetic acid in the surface of the wood," and in the other it is "neutralization of that portion of the acid which is exposed to the air." He says further:

"As the initial fermentation is prevented at the surface of the board, it necessarily follows that the interior of the board will not be stained, and will

not be impregnated with or in any way affected by the neutralizing agent with which the surface only of the board is treated."

It is the prevention of the "initial fermentation" that prevents the stain. That being prevented by the neutralizing agent, the interior of the board will not be stained either by the mold or the agent. And, again, he says:

"As a result of the rapid immersion or dipping of the stock in the alkaline bath and the subsequent drying of the stock its thin surface portion, which is planed off when the stock is dressed, becomes a protective skin. the pores of which are closed by neutralized sap and microscopic deposits of the neutralizing agent."

The same thought as to how the application of the chemical solution called for works out the desired result is implied in the fourth claim of the patent covering the product of the process. It is in these words:

"As new article of manufacture, an undressed board having a protective skin or surface layer formed of neutralized sap and the neutralizing agent. said skin or surface layer being of a depth which will enable it to be planed off by the usual dressing of the board."

It was the thought, then, of the patentee that the neutralizing agent and the acid in the sap on the surface combined and together form a protective skin by closing the pores of the surface of the board. The air cannot get in to oxidize the acid in the inclosed sap, and the acid therein cannot get out to be oxidized by the outside air. The two cannot come together—oxidation cannot take place, fermentation cannot set up, sap mold cannot be formed, and discoloration cannot occur. The acid in the sap on the surface is neutralized, and that in the board within the protective skin or layer formed by such sap and the neutralizing agent is thereby kept from the oxygen in the air. Such is the way and the only way in which the patentee conceived that an alkaline solution prevents sap stain. Of course, it must have been contemplated, had he duly reflected, that the water in the inclosed sap would pass through the protective skin or layer and evaporate in the process of seasoning, otherwise the sap would not dry out, and the lumber become seasoned. But nothing is said on this subject or anything indicating that he had reflected on this matter at all.

It was involved in this theory that the solution finished its work upon its application. It then neutralized the acid in the surface sap, and combined therewith to form the protective layer or skin. There is not the slightest indication that he had any idea that thereafter it had any continued effect other than in the result then accomplished.

As heretofore intimated, there is room to say that this theory was a mistake. The evidence does not justify the conclusion that there is sufficient organic acid in the surface of the lumber to combine with an alkaline solution and form a protective skin or layer. No one has testified as to ever having seen a skin or layer on the lumber after the application of an alkaline solution thereto. Appellee's expert has it that the way an alkaline solution prevents sap stain is through its corroding effect on the organisms which are the source of the stain. Possibly it has a harmful effect on them also through the deposit left after

the evaporation of the water therefrom absorbing the water in the organisms. He thinks that, so far as it neutralizes the organic acids in the sap, it aids their growth by increasing the nutrition. Appellant's expert does not claim otherwise, except possibly he thinks that in some way such neutralization acts harmfully rather than otherwise. Such being the case, it is clear that, in order for an alkaline solution to be efficient in preventing sap stain, it is essential that such deposit should continue on the board and retain sufficient alkalinity to kill and absorb and neutralize, if that hurts, during the 60-day seasoning period, or, at least, until near its end. It is not sufficient that there be an alkaline effect at the time of the application. There must continue to be an alkaline effect as long as there is a possibility of spores lighting in the sap and these organisms developing therefrom. And it may be that herein lies the difference in efficiency between limewater and the sodium bicarbonate solution. In a bicarbonate of soda solution a much greater quantity of the base is in solution than in limewater, so that, after the evaporation of the water therefrom, there will be a much greater deposit left in the one case than in the other. Besides, what is left in the one case will retain its alkalinity as long as it remains on the board; whereas, what is left in the other may soon lose its alkalinity. But this can have no bearing on the question as to the nature of the process covered by the patent as the patentee conceived it to be. The only theory that can have relevancy thereto is patentee's theory as to how an alkaline solution acts to prevent sap stain, based upon his theory as to its cause, which we have stated, and it does have significance in determining what that conception was. According to that theory, limewater should be effective in preventing sap stain. It has sufficient alkalinity to neutralize all the organic acid in the surface sap if not in all the sap of the lumber to which it is applied. It is inexpensive, and no good reason can be given why, from patentee's standpoint, it should have been excluded from his process.

Limewater then is within the patentee's theory as to how the process of the patent acts to prevent sap stain and within the general expressions of the first claim and descriptive part of the specification to which we have referred. It is this which the two statements relied on have to meet, and, notwithstanding it, to convince that the intent of the patentee was not so broad, but was limited to the subclass of alkaline solutions to which the preferred one, sodium bicarbonate, belongs. The first one in order is the one that is contained in the specification. Appellant treats it as made for the purpose of qualifying the general expressions used, and showing exactly what alkaline solutions were within the process, and, as limewater is not one of the solutions so enumerated, it is argued that it was excluded from it. But such is not the nature of the statement. It was not made for any such purpose. Twice, as already stated, in the descriptive part of the specification where an alkaline solution is called for preference is expressed for a bicarbonate of soda solution. Subsequently the patentee refers to this preference in these words:

"I have stated that a solution of bicarbonate of soda is thought to be preferable for the treatment of the stock in the manner described. This is for

the reason that bicarbonate of soda is almost perfectly soluble in water, is inexpensive, and is sufficiently alkaline for the purpose."

He then deems it important to negative the idea that, by expressing a preference therefor, he intended to limit himself thereto, and to give a reason for not so doing. The statement relied on constitutes that reason. Immediately following the foregoing quotation he continues in these words:

"I do not wish, however, to limit myself to this particular chemical, as any compound of potash, soda, or ammonia, whether caustic or carbonated, may be employed, provided it has the properties of an alkali, the strength of the solution depending, of course, upon the alkaline activity of the chemical used."

In saying that he did not limit himself to the preferred solution because others might be employed, it was not necessary for the sufficiency of the reason that he should enumerate all the solutions that might be employed. A reference to one or more that might be employed was sufficient. As a matter of fact, he did not enumerate all the solutions of the subclass to which the preferred solution belonged; i. e., whose base was one of the metal alkalies or a compound thereof having the properties of an alkali. He enumerated only those whose base is a compound of potash, soda, or ammonia having such properties. And the thing that made them available was the fact that they had the "properties of an alkali." Any other chemical base having such properties would be equally available. But he does not stop here. He then notes the fact that certain of the alkaline solutions which he says may be employed and are within his process are practically unavailable or are inefficient. He continues in these words:

"Certain of the above-mentioned compounds besides being comparatively expensive will leave a crystalline deposit on the stock which renders it comparatively unmarketable, while certain others—as for instance the compounds of ammonia—are too volatile, and, therefore, unless properly confined, will vaporize before the stock has received the proper treatment. As stated, however, these compounds are all available although the compounds of soda (and particularly the carbonate and bicarbonate of soda) are preferable, because they are inexpensive and do not materially discolor the lumber or leave a crystalline deposit upon the surface thereof."

It is not likely that he would include such solutions and leave out one against which from his standpoint neither objection could be urged.

It is in this excursion from the main course of the specification that the statement in question occurs, and not in the main course.

Is it to be said, then, that where a patentee in his claim calls for any alkaline solution—i. e., a solution whose base has the properties of an alkali and itself has alkalinity—frequently uses such general expressions in the descriptive part of the specification in referring to the solution he has in view, and proceeds upon a theory which permits the employment of, if it does not call for, any such solution, does not intend to embrace within his claim a particular alkaline solution, from his standpoint practically available and efficient, because in giving a reason for not limiting himself to a certain other alkaline solution for which he has expressed a preference he says that certain alkaline solutions, including the preferred one and of the same subclass, some

of which he notes are practically unavailable or inefficient, may be employed, and the alkaline solution in question is not one of them and does not belong to that subclass? We think not. Had it been the intent of the patentee to limit himself to said subclass of alkaline solutions or to those members of it specifically referred to, it would seem that he would have said something in the main course of the specification, so indicating, and not have used language that took in every alkaline solution without any qualification whatever other than that it should be "weak."

We come now to the other statement relied on which was made in the course of the proceedings in the Patent Office. It will be found on due consideration to be without any limiting effect, and such a consideration of the entire proceedings therein will leave no question that the patentee intended to include limewater in the first claim of his patent. The application on which the patent was issued was filed July 11, 1902. A previous application had been filed September 16, 1901. It was rejected by the examiner October 14, 1901. Reconsideration was requested December 17, 1901. It was again and finally rejected by the examiner January 7, 1902. With a view to an appeal an amendment was tendered March 24, 1902. A statement was filed with the tender by the applicant, setting forth the reasons why he thought he was entitled to a patent. The amendment was allowed March 28, 1902. No appeal was taken. Instead, the application on which the patent was granted was filed. It seems to have been treated as a continuation of the original application. This application was rejected by the examiner August 11, 1902. An amendment was filed March 12, 1903. The application was finally rejected by the examiner August 16, 1903. An appeal was taken August 19, 1903. The board of examiners reversed the decision of the examiner, and thereupon the patent issued.

On the first application the specification contained no such statement as that contained in the patent on which reliance is had to limit its extent on which we have just commented. It called for an alkaline solution and expressed a preference for a 5 per cent. solution of bicarbonate of soda or sal soda, and went no further. In the descriptive part it called for rapid dipping. The applicant there said:

"While the exact procedure and solution described are thought at the time to be preferable, I wish to reserve to myself the right to vary the procedure and the strength and constituents of the alkaline solution in accordance with the character of the lumber and the conditions under which the stock is treated, provided only that such variations are properly embraced within the scope of the protection prayed."

He referred to previous attempts to prevent the stain. They consisted in either withdrawing the sap or complete impregnation or total saturation of the lumber with chemicals or a combination of both. These he said were expensive and also undesirable, as they affected the strength of the lumber.

The specification contained a single claim. It was in these words:

"That process which consists in impregnating the surface only of undressed wood with an alkaline solution, the impregnation not exceeding the surface depth which may be planed off by the usual dressing of the wood."

It is clear from this that the process as the patentee first conceived it to be included limewater; it being an alkaline solution. If, then, in the patentee's thought, the process of the patent was limited to a particular class of alkaline solutions, the intent to so limit arose subsequent to the first application. This application was rejected on the ground that surface treatment of wood with an alkaline solution was not new, referring to Dick's Encyclopedia and Britton on Dry Rot, and on the further ground that, if it were, the difference between surface treatment and deeper treatment was simply a difference of degree. And on the second and final rejection of January 7, 1902, the examiner adhered to his position that the treatment of the surface "with an alkaline solution" was old. He said:

"Dick No. 6,201 shows the treatment of the surface of the wood with an alkaline solution, 'pearl ash or soda in luke warm water, adding a little lime to it and wash the inside of the vessel well with the solution.' The limewater of Britton, p. 122, is an alkaline solution used for the same purpose that applicant uses it—'to correct the acid.' Page 154 shows the very alkali used—carbonate of soda."

Here it is distinctly stated that limewater is an alkaline solution, and hence covered by the process for which a patent was sought. When the statement accompanying the tender of the amendment on March 24, 1902, was made, the applicant had before him the reasons thus given for rejecting the application, and he undertook therein to. meet them. He disposed of the Dick reference, claiming that the process there referred to was for removing the disagreeable taste from new wooden vessels, and had nothing whatever to do with preventing sap stain. Britton on Dry Rot was dealt with in this way:

"In Britton on Dry Rot, the object sought is to prevent wasting away of the tissues or fibres of the wood, and there is no evidence that Britton knew of the lumbermen's problem of sap staining or discoloration which depreciate the value of the lumber for manufacture and sales. Certainly Britton had not my idea in mind at all. Further, he speaks of impregnation which I do not claim, and which would with my invention defeat the object sought for. This disposes of extracts from Britton, pp. 122, 154."

The idea of the examiner that limewater was an alkaline solution, and hence was within the process of the desired patent, was not combatted. It was accepted as true. The reference was denied pertinency solely on the ground that the use of limewater therein mentioned was not for the purpose of preventing sap stain, but decay and the treatment with it was deeper than a mere surface treatment. It is in this same document that occurs the other statement relied on by appellant as negativing that the patent in suit was intended to include limewater. In considering its effect, it should be noted that this statement is made during the pendency of the first application, the process of which covered broadly any alkaline solution, and the specification in which contained none of the limiting words of the specification of the patent in suit relied on and heretofore considered, and in the same document in which we have the evidence just referred to which shows beyond question that the process included limewater.

That statement is in these words:

"In common with others who have sought to solve this problem, I have tried lime solutions, salt solutions, warm water, steam, etc., all of which were uncertain and erratic."

If this were all in this connection, it might be difficult to reconcile this statement with the idea that the applicant intended to include limewater in his process as shown by the strong considerations referred to. But it is not all. The matter is cleared up by the immediately following sentence in which he sets forth just how he had theretofore tried lime solutions. It is as follows:

"The lime and salt solutions, hot water, etc., have always been used in large quantities, either being poured upon the lumber or the lumber being immersed in the lime or salt solution or water for a long time, with the idea of thorough saturation; while in my process an essential point is to treat the surface only which I accomplish by rapid dipping."

This shows that he regarded his use of lime solutions not an anticipation of his desired patent, though it covered them, because his use thereof had not been on the surface only, an essential feature of his process, but "with the idea of thorough saturation." It was not an anticipation on the same ground that the reference to limewater by Britton on Dry Rot was not. It was a deeper treatment than a mere surface treatment. The statement relied on, therefore, is not inconsistent with the application or other statements in the document in which it occurs.

The amendment tendered, which this document containing this statement accompanied, was the substitution of another claim for that in the specification of the first application. It is in these words:

"The process of treating undressed lumber to prevent sap staining consisting in merely dipping the wood in a weak alkaline solution whereby the solution is caused to penetrate only that surface depth which is planed off by the usual dressing of the wood."

In the request itself, the applicant made it plain that what he regarded was the novel feature of his process was the surface treatment for the purpose of preventing sap stain; i. e., it contained two elements—extent of treatment and purpose of treatment. The solution called for was any alkaline solution, and there was no novelty in this feature of the process. He said:

"The examiner has not cited any patent to show the surface treatment of undressed lumber in order to prevent sap stains, and, being a pioneer in this art, the applicant's application should be accorded that treatment which is usually given in cases presenting pioneer improvements."

The conclusion must be, then, that the first application covered limewater. There is no escaping it.

Then comes the second application. The specification presented then was substantially as it is in the patent in suit. It contained the first of the two statements relied on by appellant heretofore commented on. The rejection of the examiner was based on substantially the same grounds as before. Dick's Encyclopedia and Britton on Dry Rot were again referred to as affecting the novelty of the patent. In addition, reference was made to three patents, to wit, No. 877 to Ringgold and

Earle, August 6, 1838; No. 106,625 to Sheldon, August 12, 1870; and No. 273,861 to Loomis, March 13, 1883. These three patents were referred to as justifying this statement:

"The use of alkalies to prevent mold and to preserve timber is old."

The substance called for in the Ringgold and Earle patent was "strong limewater," that in the Sheldon patent was "caustic lye," and that in the Loomis patent was a mixture of "limewater, caustic ammonia and sal soda." The examiner, therefore, classed limewater with members of that subclass of alkaline solutions to which appellant would limit the patent, and named them all "alkalies." His position in this connection again was that limewater was an alkaline solution, and hence was within the process called for by the patent. How, then, did the applicant meet this position? By claiming that limewater was not within the patent? No. He met it as before by claiming that all former treatments of wood involved more than the surface, and that, therefore, they were not anticipations of his process. He said nothing until March 12, 1903, at the time he filed the amendment of that date. He then said:

"It is believed that the treatment of lumber to neutralize the sap at the surface only thereof is clearly patentable over the art which contemplates the complete saturation of wood and the destruction of its vitality."

And again he then said:

"It is submitted that there is absolutely nothing disclosed in this record which even remotely suggests the neutralization of the surface sap only of undressed lumber to prevent surface staining and to preserve the vitality of that part of the lumber which remains after the ordinary dressing thereof."

It will be noted that it is "the sap at the surface only" or "the surface sap only" that is neutralized by his process.

His response to the Ringgold and Earle patent reference was that it contemplated "the removal of the sap and occupation of its place by preservative substance." He said:

"There is complete saturation and necessarily a correction of the entire body of sap."

Not a word is said about limewater "the preservative substance" of the patent not being an alkaline solution, and hence not within his process. And impliedly the last quotation shows that in his thought his process did not involve "correction of the entire body of sap," but only as put in the former ones the "surface sap."

His reference to the Sheldon and Loomis patent references was substantially the same as that to the Ringgold and Earle patent reference. This clear indication that in the thought of the applicant limewater was within his process comes after in order of time the statements relied on by applicant as showing that limewater was not within it. Both are now behind us. It cannot be urged, therefore, that either or both of them indicate an alteration after this in his thought by which limewater was excluded from his process. And it is plain that at no time was it his thought that limewater was not within it notwithstanding these statements. He could not have intended to indicate thereby that it was not within his process. That such was the case is

further confirmed by what was said on the appeal before the board of examiners. The examiner's statement on the appeal listed the references which he had made in the course of the proceedings before him and in addition referred to the British patent No. 1552 issued in 1879 to De La Sala, the process of which called for a "solution of potash or other alkali." He said generally that they described "the treatment of wood by saturation with alkali to a greater or less degree and then subsequent drying." The ground of his decision he puts thus:

"At the most his process differs only in that it is a partial carrying out of the process disclosed in the references. It is an incomplete saturation differing from the ordinary process of saturation merely in degree."

The brief filed on behalf of the appellant dealt with this position and these references. Therein his discovery was set forth in this language:

"It has remained for this appellant to discover that the rapidly dipping the undressed lumber as it comes from the saw, in a weak alkaline solution, preferably sodium bicarbonate, the sap exposed at the surface of the cellular structure is neutralized or corrected, and that the lumber is thus protected with a protective skin or surface layer formed of the neutralized sap and the neutralizing agent in combination. This protective skin or layer protects the sap upon the interior of the board from contact with the air, thus preventing fermentation thereof, which would otherwise result in the staining of the stock. Great stress is laid upon the rapid dipping of the undressed wood into the alkaline solution because it is only by this rapid manipulation that the protective skin or surface layer is confined to the inconsiderable depth which insures its complete removal when the lumber is dressed by planing in the usual manner. Attention is particularly directed to the fact that, by the practice of this process, the lumber is provided with a protective envelope which, while absolutely preventing the deterioration of the stock, is entirely eliminated when the lumber is dressed, leaving a dressed board in its natural condition totally devoid of any artificial preservative agents and of absolutely high grade. In other words, the practice of the process merely produces a protective skin or layer which closes the openings of the pores or cells of the wood with a neutral substance, which, while absolutely preventing sap staining, does not otherwise affect that portion of the wood which remains as clear high grade lumber when the surface coating or layer is planed off by the usual dressing of the board."

He disposes of the prior art by claiming that it all involved a deeper treatment than of the surface only and none of it was for the purpose of preventing sap stain. It is important to refer here to his manner of dealing with the Ringgold and Earle patent, the process of which called for limewater and that only, which it was claimed was not intended to be within the process of the patent. He said:

"Certainly the practice of Ringgold's process would tend to prevent sap staining, but the lumber would be absolutely useless for practical purposes. The removal of the sap makes the lumber entirely dead, and it is clear that the very essence of the applicant's invention, to wit, the rapid dipping of the wood, which results in the production of an absolutely natural clear high grade board after dressing, is absolutely absent. It was known many years before 1838, the date of Ringgold's patent, that wood could be preserved by totally impregnating it with preservative substances, and, while this knowledge was of use in producing fireproofing material, it was of absolutely no use in the solution of the problem confronting the lumber industry, the production of an unstained natural board from an undressed sap, after the latter had been stored in open piles for months or perhaps years."

Here, again, we find an entire absence of any claim that limewater was not such an alkaline solution as was called for by the process of the patent which would have been a sufficient answer to it. Instead, it was assumed that limewater was such an alkaline solution, and it was urged that the reference was not pertinent because there was a more prolonged application of it to the lumber, and it was not applied for the purpose of preventing sap stain. This brief contains the patentee's last statement before the Patent Office concerning his process. The board of examiners reversed the examiner's decision on this ground:

"None of the references cited describes a process intended or adapted to perform the appellant's purposes."

It is clear, then, from the proceedings in the Patent Office that limewater was intended to be within the process of claim 1 of the patent in suit if the matter was otherwise uncertain. And it must be accepted as the patentee viewed it that the novelty of that claim was not in the use of any particular alkaline solution, but in the use of any such solution for the purpose of preventing sap stain, and in limiting the treatment to the surface by a rapid application of the solution thereto. This being so, he did not limit his claim in the matter of the alkaline solution used, but took in every such solution. In so doing he made his claim too broad. For many years prior to his application limewater, an alkaline solution, had been in public use for this very purpose, and in such use thereof it had been applied rapidly to the timber and the treatment thereof had been limited to its surface, and it cannot be said that it was then an abandoned experiment. The invention, if such it be, was therefore not new, and the claim must be held void on this ground. With it must go the second claim, also, as in the conception of the patentee limewater was the equivalent of the specific alkaline solution called for thereby. The limewater process was an anticipation thereof as well as of the first claim.

Having reached the conclusion that the patent is void for want of novelty, there is no occasion to determine whether it was lacking in invention, the ground upon which the lower court held it to be invalid. The question of invention as well as that of novelty requires a consideration of the prior art.

The prior art disclosed this limewater use. It also disclosed in earlier patents processes calling for the use of the identical alkaline solutions to which the appellant would limit the patent, such use not being to prevent sap stain, but to prevent decay. Some of the patents making such disclosures were referred to by the examiner, being those which we have mentioned in our account of the proceedings in the Patent Office. Over a dozen other patents have been cited herein and were relied on by the lower court as calling for substantially the same use. The difference between the use of limewater and that of the sodium bicarbonate solution is one of degree. A given quantity of the latter has more alkalinity than the same quantity of the former. When applied, therefore, to the lumber, it will have greater alkaline effect. It has more alkali in solution, so that, after the water has evaporated from that portion adhering to the lumber, the deposit left will have

greater alkalinity and will remain there for a longer period. And, so long as it remains, it will not lose its alkalinity, whereas what is left from the other may.

The difference between the use of the identical alkaline solutions to which appellant would limit the patent in suit called for in the earlier patents and between the use thereof called for by that patent was to a certain extent difference in degree also. In the earlier patents the treatment was deeper than the surface, secured by a prolonged application. In the patent in suit it was limited to the surface, secured by a rapid application. This difference was due to the fact that the agents of decay in the one case had to be met during the life of the lumber, whereas the agents of sap stain in the other case had to be met during the seasoning period of 60 days, and no longer. But this was not the sole difference between these two uses. There was a difference in the purpose for which the use was made. In the one case it was to prevent decay; in the other to prevent sap stain. It was on this ground that the board of examiners reversed the examiner. If we look at the ultimate purposes of the two uses, there is more room for saying that the two purposes are not the same or analogous than if we look at the primary purposes thereof. The ultimate purposes are to prevent decay and to prevent sap stain. The primary purposes are to combat, in the one case, the agents of decay; in the other, the agents of sap stain. The agents of sap stain as we have seen are a certain species of fungus. The agents of decay are, in part at least, and some of the earlier patents so recognized it, also certain species of fungus. The species of fungus in the two cases may be different, but otherwise it is quite difficult to see any difference in the primary purposes of the two uses. In this connection it should be noted that one of the experts in the case belonging to the Bureau of Plant Industry of the United States Department of Agriculture and in charge of the investigation of the diseases of trees and lumber testified that he always considered the action of the blue fungus as a preliminary stage of decay.

Though we do not find all the elements of the patent in suit limiting it to the alkaline solutions to which appellant would confine it in the limewater use, or in the use called for by the processes of the earlier patents, treating these two uses separately, exactly as they are to be found in that process, yet, if we treat the prior art as a whole, we do find all the elements of the process of the patent in suit in the prior art. In the limewater use there is the surface treatment secured by rapid application to prevent sap stain and in the use called for by the processes of the earlier patents are the same alkaline solutions.

The ground upon which the lower court held the patent in suit to be lacking in invention was that the sole difference between it and the prior art was one of degree only, except in so far as there was a difference in purpose between it and the earlier patents, and there though the purposes differed they were analogous. It applied to this case the doctrine that where the difference between the old and the new is one of degree merely, or where the difference is in purpose but the purposes are analogous, ordinary reasoning and not invention is involved. And it cited in support of its position the followng au-

thorities: Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 12 Sup. Ct. 601, 36 L. Ed. 327; Leggett v. Standard Oil Co., 149 U. S. 287, 13 Sup. Ct. 902, 37 L. Ed. 737; Thompson-Hunter Elec. Co. v. Nassau Elec. Co. (C. C.) 98 Fed. 105; Lauman v. Urschel Lime Co., 136 Fed. 193, 69 C. C. A. 206; Walker on Patents (4th Ed.) §§ 28, 31.

An attack is made here on the application of this doctrine to this case. But for the reason stated we do not find it necessary to deal with it.

The decrees of the lower court are affirmed.